UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MAYRA MELO,                                          :

                  Plaintiff,            :            17 Civ. 4716 (AJP)

         -against-                :            **OPINION & ORDER**

NANCY A. BERRYHILL,                          :
Acting Commissioner of Social Security,
                            :

                  Defendant.            :

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

         Pro se plaintiff Mayra Melo brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI").  (Dkt. No. 2: Compl.)  The parties have consented to decision of the case

by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 10.)  Presently before

the Court is the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c).  (Dkt. No. 13: Comm'r Notice of Mot.)  Melo has not responded and the time to do so has

passed.  (See Dkt. No. 6: Scheduling Order; Dkt. No. 17: Memo Endorsed Order.)

         For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 13) is GRANTED.

## FACTS

### Procedural Background

         Melo applied for DIB and SSI benefits on July 11, 2013, alleging a disability onset

date of July 22, 2012.  (Dkt. No. 11: Administrative Record ("R.") 184, 188.)  Melo's applications

were denied on September 13, 2013 (R. 110-16), and she requested a hearing before an Administrative Law Judge ("ALJ") on October 9, 2013 (R. 120-24). On March 24 and July 21, 2015, represented by counsel, Melo had hearings before ALJ Dina Loewy (R. 53-91), who denied Melo's benefits application on September 25, 2015 (R. 32-48). ALJ Loewy's decision became the Commissioner's final decision when the Appeals Council denied review on April 21, 2017. (R. 1-3.)

**<u>Non-Medical Evidence and Testimony</u>**[1/]

      Born on December 26, 1956, Melo was 55 years old at the alleged July 22, 2012 onset of her disability. (R. 184, 188.) Melo has a college degree, and previously worked at MoneyGram in customer service and as a receptionist, and at Union Telecard as a telemarketer, which involved "working outside doing promotions, trying to find new clients" three days per week, and "follow[ing] up [with] them [on] the phone [to] try to place new orders." (R. 59-61.) At Union Telecard, Melo sat and called clients for "about two hours" out of the day, but otherwise was "[a]lmost never" seated because she was "always moving looking for the cards." (R. 63-64.) After some confusion regarding this portion of Melo's testimony, Melo clarified that she "average[d]" three days per week outside soliciting business, and spent between 15-20 hours per week in the office on the phone during her 40 hour work week. (R. 80-81.)

      Melo stopped working in 2008 when she was laid off and collected unemployment for two years. (R. 59-60.) Melo continued looking for work until she suffered a left ankle fracture in July 2012, and has not worked since. (R. 60.)

---

[1/]     The Commissioner only addresses Melo's physical impairments, because Melo's "complaint in this action alleges disability solely due to a fractured left foot." (Dkt. No. 14: Comm'r Br. at 1; <u>see</u> Dkt. No. 2: Compl. ¶ 4.) The Court nevertheless addresses Melo's psychiatric treatment records in the interests of justice because Melo is pro se, and ALJ Loewy's analysis of Melo's mental impairments is intertwined with the RFC and step four determinations.

In her August 3, 2013 function report (R. 230-40), Melo stated that her daily activities included waking up at 7:30 AM, taking a shower, preparing food, and going to appointments if necessary, after which she went to bed "with [her] feet up" (R. 231). Melo's pain began following an accident in which she injured her left foot, causing a "very strong and sharp pain" aggravated by "anything" involving use of her left foot. (R. 238-39.) Melo's pain was located on the side of her left foot and did not radiate to other places. (Id.) Melo stated that her injury required her to use a cane because of difficulty walking, caused her to become tired easily and caused insomnia. (R. 231.) Melo's impairments also made it difficult to get dressed or shower because she could not stand for long periods of time. (Id.)

Melo said that she was forgetful and relied on her daughter for reminders. (R. 232.) Melo prepared her meals daily, did her own laundry "sometimes" with assistance from her daughter who also did the cleaning, and went shopping "every two weeks." (R. 232-34.) Melo's hobbies and interests included listening to a meditation CD and watching television "every day." (R. 234.) Melo spent time with others including a church support group "generally once a week," and had no problems getting along with family, friends, neighbors or others. (R. 235.)

Melo stated that she could lift "[n]o more than 10 pounds," stand for "[p]robably 10 minutes," walk for "[m]aybe 15 minutes but helped by a cane," sit "most of the time" and use her hands. (R. 235-36.) However, Melo stated that she could not climb stairs, kneel, squat or reach. (R. 236.)[2] Melo claimed that she could walk two blocks before having to stop and rest for 15 minutes. (R. 237.)

---

[2] The form asked: "Explain how your illnesses, injuries, or conditions affect any of the following." (R. 235.) It appears that Melo misinterpreted the question, instead answering "yes" or "no" in most categories, i.e., indicating whether she could or could not perform the particular function listed. (See R. 235-36.)

Melo further claimed that she had no problems paying attention, could finish what she started, and could follow written and spoken instructions. (Id.) Although Melo stated that she had problems getting along with authority figures, she did not explain why, and further stated that she had not lost a job because of problems getting along with others. (Id.) When asked how "stress or changes in schedule affect" her, Melo responded that she handled those situations well. (R. 238.)

The March 24, 2015 hearing did not proceed because Melo did not have an interpreter and ALJ Loewy only had "minimal records" at that time. (R. 89.) ALJ Loewy remarked that "[t]he records that we have are quite old," "[m]ost of them . . . a year and a half old" and "some of them . . . even two years old." (Id.) Melo's attorney stated that Melo had received "treatment only from one place" since 2010, "Jerome Medical Center . . . for her physical problems and her mental limitations." (R. 90.)

At the July 21, 2015 hearing, when asked why she felt disabled and unable to work, Melo responded that she "ha[d] a lot of pain" caused by her left ankle fracture (R. 64-65), and also noted that she had diabetes and depression (R. 62). Melo stated that she could not sit for too long and felt better when her left leg and foot were elevated. (R. 64.) Melo did no laundry or grocery shopping, and instead relied on her daughter for help. (R. 64-65.) Melo testified that her left ankle fracture prevented her from walking more than ten minutes at a time, or standing for more than "five or six minutes" at a time, because she could not put weight on her left foot. (R. 67.) Melo could only sit without pain for "one hour more or less" because her left "foot gets numb and tense," which she alleviated by elevating her left leg and foot. (R. 67-68.) Melo attended the hearing with a cane and a left foot brace that had been prescribed to her since she fractured her foot. (R. 69.) Melo's doctor informed her that the solution to her left ankle pain was surgery, but that surgery could result in Melo losing her leg because of her diabetes. (R. 65.)

As to her psychological impairments, Melo testified that she saw a psychiatrist each month to treat her depression and panic attacks. (R. 69-70.) Melo stated that her panic attacks caused her to not "walk very well" and made her afraid and paranoid. (R. 70.) ALJ Loewy asked Melo's counsel:

> ALJ: . . . . Were you planning to give me records from the psychiatrist? Because you know I'm not going to give it much weight without records.
>
> [Melo's] ATTY: Well, you subpoenaed the place [Jerome Avenue Clinic] and that's all they gave you, Judge. . . .
>
> . . . .
>
> And we've got all their records.
>
> . . . .
>
> ALJ: . . . . I'll give it the weight that I'm able to give it based on not having them. Okay?
>
> ATTY: Okay.

(R. 70-71; see R. 171: 3/28/15 Jerome Avenue Medical Center Subpoena.)

Vocational expert Ms. Maraco also testified at the hearing before ALJ Loewy. (R. 71.) ALJ Loewy told Ms. Maraco that Melo was 58 years old and had a college degree. (R. 72.) Maraco stated that Melo's former work as a receptionist and as a Union Telecard telemarketer qualified as a specific vocational preparation level 3, light exertional level, given that Melo "was out three days a week taking customers." (R. 73.) ALJ Loewy asked Maraco

> to assume a hypothetical claimant with the vocational factors that you've identified and ask you to assume she can sit seven hours in the day and stand or walk one hour in the day and . . . standing or walking only 30 minutes at a time before being able to sit down; being allowed to use a cane to ambulate [to and from the workstation]; only occasional push/pull with arm controls. . . . And no left foot control meaning no left having to move levers. Occasional climbing ramps or stairs[;] rarely having to climb a full flight; never climbing ladders, ropes, or scaffolds; occasionally balancing or stooping; never kneeling; frequently crouching; never crawling; only

occasional squatting; avoiding concentrated exposure to hazardous materials, and unprotected heights.

And I'll ask can she do any of her past work?

(R. 73-74.)  Maraco responded that Melo could work as a "telemarketer as defined in the DOT," which "fit within that hypothetical."  (R. 74.)  However, if Melo were further limited to unskilled work, she could not perform the job of telemarketer.  (R. 75.)

Melo's attorney asked Maraco to "[a]ssume the same hypothetical as" ALJ Loewy described, but that "the person would have only occasional interaction with the general public."  (R. 83.)  Maraco testified that Melo would not be able to perform a telemarketing position, which "require[d] certainly more than occasional interaction."  (Id.)

**Medical Evidence Before the ALJ**

### Dr. Pradip Joshi

On September 8, 2011, Dr. Pradip Joshi wrote that Melo fractured her left foot's fifth metatarsal bone; Melo informed Dr. Joshi that she was diabetic and did "not want surgery at this time."  (R. 494.)

### Dr. Virginia Martinez

On July 26, 2012, Dr. Virginia Martinez saw Melo for a "diabetes follow up," finding Melo alert, oriented, in no acute distress, well developed, with a normal musculoskeletal examination with full range of motion, full range of motion in her extremities with no clubbing, cyanosis or edema, and a normal diabetic foot examination.  (R. 414.)  Melo's glucose and hemoglobin A1c were abnormal.  (R. 415.)  Dr. Martinez noted a "[c]losed fracture" of Melo's foot and prescribed Ibuprofen.  (Id.)

On August 16, 2012, Dr. Martinez wrote a "To whom it may concern" letter stating

that Melo had uncontrolled diabetes and hypertension requiring her to constantly monitor her blood glucose "prior to insulin administration and have multiple appointments." (R. 297.) Dr. Martinez wrote that Melo was "experiencing difficulty controlling her diabetes due to her work schedule," and "recommended her to decrease her work hours and if possible to have a home care [aide] to help her manage her disease." (Id.) In July 2013, Dr. Martinez wrote a second "To whom it may concern" letter identical to her August 16, 2012 letter. (Compare R. 296, with R. 297.)

On August 30, 2012, Melo saw Dr. Martinez for a "[c]ough"; Melo was in no acute distress, and reported diabetes "without mention of complication." (R. 410.)

At a January 25, 2013 follow-up appointment, Melo denied diabetic symptoms of polyuria, polydypsia, nocturia and blurred vision, and denied hypertension symptoms of chest pains, headaches and shortness of breath. (R. 406.) Melo was in no acute distress, and exhibited full range of motion in her extremities with no clubbing, cyanosis or edema. (Id.) Melo's glucose and hemoglobin A1c were abnormal. (R. 407.)

On July 15, 2013, Melo was in no acute distress, and denied polyuria, polydypsia, nocturia, numbness, blurred vision, chest pains, headaches or shortness of breath, and her diabetic foot exam was normal. (R. 402.) Melo's hemoglobin A1c was "improving," and her blood glucose level was normal. (R. 403.)

On August 22, 2013, Melo was in no acute distress, and denied polyuria, polydypsia, numbness, blurred vision, chest pain, headaches or shortness of breath, but did report nocturia. (R. 400.)

On October 22, 2013, Melo reported episodes of dizziness, but denied nocturia, polyuria or vomiting. (R. 397.)

On November 5, 2013, Melo denied polyuria, polydypsia, nocturia, numbness,

blurred vision, chest pains, headaches or shortness of breath. (R. 395.) Melo was in no acute distress and reported diabetes "without mention of complication." (Id.)

On February 6, 2014, Melo appeared in no acute distress, her musculoskeletal exam was normal with full range of motion, and she had full range of motion in her extremities with no clubbing, cyanosis or edema. (R. 391.) Melo was alert and oriented, and her cerebellar function, cognitive exam, cranial nerves, gait, motor strength in the upper and lower extremities, strength, tone, reflexes and sensory exam were normal. (Id.) Melo, however, walked with a cane and had a cast on her left foot and her deep tendon reflexes were +2. (R. 391-92.) Melo's hemoglobin A1c was abnormal. (R. 393.)

On June 16, 2014, Melo denied polyuria, polydypsia, nocturia, numbness, blurred vision, chest pain, headaches or shortness of breath. (R. 384.) Melo was in no acute distress and reported diabetes "without mention of complication." (Id.) Melo's glucose and hemoglobin A1c were abnormal. (R. 385.)

On September 9, 2014, Melo reported that her blood sugar level was 275 and that she had been taking her medication as prescribed. (R. 379.) Melo stated that she woke up that morning feeling dizzy with headaches and full body numbness; on the Sunday prior, Melo "ate a plate of cake and [had] some beer." (Id.) Melo's glucose and hemoglobin A1c were abnormal. (R. 380-81.) Melo was well developed, in no acute distress, her musculoskeletal exam was normal with full range of motion, and she had full range of motion in her extremities with no clubbing, cyanosis or edema. (R. 379.)

On October 14, 2014, Melo reported left foot pain and diabetes "without mention of complication." (R. 377.) Melo had "poor adherence to" her medication, and took her insulin only when her fingerstick blood sugars were elevated. (Id.)

On December 18, 2014, Melo reported that she was depressed, cried easily, could not sleep, had difficulty concentrating and had low self esteem.  (R. 370.)  Dr. Martinez wrote that Melo appeared well developed, in no acute distress and reported diabetes "without mention of complication."  (Id.)  Melo's hemoglobin A1c, however, was abnormal but stable.  (R. 371.)

On March 4, 2015, Melo saw Dr. Martinez for her diabetes mellitus "without mention of complication."  (R. 366.)  On the same day, March 4, 2015, Dr. Martinez completed a physical disability report.  (R. 335-41.)  Dr. Martinez diagnosed Melo with diabetes, nephropathy, hypertension, diverticulitis, depressive disorder and hyperlipidemia, which lasted or were expected to last 12 months.  (R. 335-36.)  Dr. Martinez opined that Melo would have to lie down during the day because of fatigue or chronic "right foot pain" (her injured foot, however, was the left, not the right).  (R. 337.)  Dr. Martinez further opined that, in an eight hour workday, Melo would be able to sit, stand and walk continuously for two hours each.  (R. 338.)  Melo occasionally could lift up to five pounds, but never anything heavier, and could never bend, squat, crawl, climb or reach.  (R. 338-39.)  Melo occasionally could finger with her right and left hands, but could never push or pull using arm controls or use her feet "for repetitive movements, such as pushing and pulling of leg controls."  (R. 339-40.)  Melo had a moderate restriction to driving a vehicle, and would have difficulty traveling to work alone using public transportation.  (R. 340.)

**Doshi Diagnostic**

On March 18, 2013, Melo underwent a three-phase bone scan focusing on the feet. (R. 289.)  The scan revealed left foot "findings . . . most consistent with acute process at the base of the fifth metatarsal bone such as arthritis versus non-union fracture."  (Id.)  The reviewing physician recommended further evaluation with radiographs.  (Id.)

**Dr. Dipti Joshi**

On September 4, 2013, Melo had a consultative internal medicine examination with Dr. Dipti Joshi of Industrial Medicine Associates. (R. 298-301.) Melo's chief complaint was her history of diabetes; Melo's last hemoglobin A1c level was unknown, and she denied retinopathy, nephropathy and neuropathy. (R. 298.) Melo also complained of a fractured left foot that "happened several months ago." (Id.) Melo described the pain as 9/10 that improved with medication and worsened with standing and walking. (Id.) Melo suffered a limp because of her foot pain and "use[d] a cane for pain and weightbearing all the time." (R. 298-99.)

Melo stated that she cooked, showered, bathed and dressed herself daily, cleaned and did laundry weekly, and watched television and read. (R. 299.) Melo appeared in no acute distress, had a normal gait and stance, and needed no help changing for the examination. (Id.) However, Melo could not walk on heels or toes or squat, and had difficulty getting on and off the examination table and rising from her chair. (Id.)

Melo's cervical spine had full flexion, extension, lateral flexion and rotary movement bilaterally; no scoliosis, kyphosis or abnormality was noted in her thoracic spine; and her straight leg raise test was negative bilaterally. (R. 300.) Melo's lumbar spine showed limited flexion and extension at 60 degrees, but full lateral flexion and rotary movement bilaterally. (Id.) Melo had full range of motion in her shoulders, elbows, forearms, wrists and hips bilaterally, and full range of motion in her right knee and ankle. (Id.) No subluxations, contractures, ankylosis or thickening was noted, and Melo's joints were stable with no redness, heat or effusion. (Id.) Melo's deep tendon reflexes were physiologic and equal in the upper and lower extremities with 5/5 extremity strength, and no sensory deficit was noted. (Id.) Melo's extremities revealed no cyanosis, clubbing, edema, significant varicosities, trophic changes or muscle atrophy, and her pulses were physiologic and

equal. (Id.) Melo's hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally. (Id.)

However, Melo "declined dorsiflexion and plantar flexion of her [left] ankle . . . because of pain," and "complained of pain when she lifted her left foot." (Id.) Melo had "some swelling of the left lateral malleolus." (Id.) Melo's left foot x-ray revealed "[n]o significant bony abnormality." (Id.; see also R. 302.)

Dr. Joshi diagnosed Melo with diabetes, hypertension and a "[f]racture of the left foot with persistent swelling around the ankle as well as on the dorsum of the foot." (R. 300-01.) Dr. Joshi opined that Melo's prognosis was stable, and that "she should avoid any heavy lifting, carrying, pushing, and pulling," as well as "any prolonged walking, climbing, or standing." (R. 301.)

As Dr. Joshi noted, Melo's September 6, 2013 left foot x-ray revealed "[n]o significant bony abnormality." (R. 302.) The reviewing physician found "no evidence of acute fracture, dislocation or destructive bony lesion," and "relatively well maintained" joint spaces. (Id.)

**FEGS Evaluation**

On January 28, 2014, FEGS social worker Agatha Irish completed a biopsychosocial summary on Melo's behalf. (R. 304-34.) Irish repeated Dr. Martinez's findings that Melo had uncontrolled diabetes and hypertension and experienced "difficulty controlling her diabetes due to her work schedule." (R. 306.) Melo also reported that she fractured her left foot when she fell on August 14, 2012. (R. 334.) Melo wore a soft brace and used a cane due to her fractured left foot pain, and was scheduled for surgery on January 27, 2014 but the appointment was cancelled. (R. 306, 308, 315, 317.)

Melo stated that she traveled independently to appointments by public transportation, but had travel limitations, i.e., she used a cane. (R. 306-07.) Melo reported that she had difficulty

standing, sitting, walking long distances and going up and down steps. (R. 307.) Melo also stated that she had difficulties seeing, bathing, dressing, grooming, using the bathroom, preparing meals, shopping, and housekeeping. (R. 312.) Melo had no back pain, swelling, redness, joint pain, foot/leg swelling, leg pain or cramps, stiffness, limitation of movement or muscle pain, but reported left foot pain. (R. 323.) Melo's neurological examination was normal, and she had no sensory, reflex, orientation or motor issues. (R. 327.) Melo described her left foot pain as "2– Moderate" and stated that it increased with walking. (R. 328.) Irish observed that Melo's gait was steady and her posture was normal. (R. 334.)

FEGS physician Deepak Sawlani stated that Melo could lift, push and pull up to ten pounds one to ten times per hour, stand and walk for less than one hour, kneel and squat for up to three hours once per hour, and could not do any repetitive bending, crouching or stooping due to her left foot pain. (R. 328-29.) Melo, however, had no sitting, reaching, manipulative, seeing, hearing, communication, cognitive, emotional, interpersonal or respiratory limitations, or any limitations maintaining her energy level, sustaining attendance and achieving adequate work pace and productivity. (R. 329-31.) Dr. Sawlani wrote that Melo's diabetes and hypertension were stable. (R. 333.)

Melo stated that she had no mental health conditions, had never been told by a mental health provider that she had mental health issues, and had never received mental health treatment. (R. 309; see also R. 315 ("Client denies any current mental health history.").) Melo never thought about killing herself and denied auditory or visual hallucinations. (R. 310.) Melo liked to read every day, spoke with her children about three times per day, and went to church when able. (R. 313.) Melo was cooperative, friendly and neatly dressed (R. 314), had a normal affect and mood, a coherent thought process, appeared stable and was oriented x3 (R. 334).

**Third Party Function Report**

   On May 16, 2014, Bibiana Blanco completed a third-party function report on Melo's behalf.  (R. 274-82.)  Melo reported that her daily activities included waking up, taking care of her personal grooming, eating, praying and taking medication.  (R. 274.)  Melo "report[ed] that before her condition she was able to work, walk long distances, be on her feet for long periods of time, be around crowds and go to church," but could no longer do these things.  (R. 275.)  Melo stated that her condition did not affect her sleep, or ability to dress, bathe, care for her hair, shave, feed herself or use the bathroom.  (Id.)  Melo further stated that she prepared her own "simple meals such as steam vegetables, soups, salad, [and] chicken breast." (R. 276.)  Melo needed no special reminders to take care of her personal needs or take her medication.  (Id.)  However, Melo could not complete household chores on her own because she became dizzy and could not be on her feet for long periods of time.  (R. 276-77.)

   Melo went outside alone a "few times a week" using public transportation, but could not drive.  (R. 277.)  Melo shopped for food "weekly and always accompanied by . . . her grown children." (Id.)  Melo could pay bills, count change, handle a savings account and use a checkbook. (Id.)  Melo did not need to be reminded to go places, and needed no one to accompany her.  (R. 278.)  Melo spent time with her family, visited with her children every Sunday and had no problems getting along with family, friends, neighbors or others.  (Id.)  Melo reported that she could not bend down due to dizziness and could not walk long distances because of left foot pain, and ambulated with a cane due to her unstable balance.  (R. 279.)  Melo could walk up to one block, but needed to stop several times while doing so due to her left foot pain and dizziness.  (Id.)  However, when asked to "[c]ircle any of the following items the disabled person's illness, injuries, or conditions affect," including lifting, squatting, bending, standing, reaching, sitting, kneeling, and a number of

psychological impairments, no items were circled.  (Id.)

Melo could pay attention, finish what she started, follow written and spoken instructions, had no issues with authority figures and had not lost a job because of problems getting along with others.  (R. 279-80.)  When asked if Melo could handle stress and changes in her routine, Blanco  wrote "N/A," and stated that she did not notice Melo exhibit any unusual behaviors or fears. (R. 280.)

### Dr. Avraham Ciment

On July 25, 2011, podiatrist Dr. Avraham Ciment of Innovative Footcare completed a "To Whom It May Concern" form on which he checked boxes indicating that Melo was "limited from full duty" and "disabled."  (R. 484.)  Dr. Ciment wrote that Melo had a broken left foot, "must stay off her foot for the next 6 week[s]" and that surgery was possible.  (Id.)

On April 24, 2013, Melo reported left foot pain, and Dr. Ciment opined that his findings were "most consistent with acute process near the region at the base of the 5th metatarsal bone involving the left foot such as nonunion of fracture or arthritis." (R. 516.)  If Melo's pain did not improve, Dr. Ciment stated that the next step would be surgical intervention.  (Id.)

On August 30, 2013, Melo stated that she had left foot pain even with a CAM walker. (R. 515.)  Melo had generalized joint pain, and pain to touch and pressure.  (Id.)  Melo stated that she was "trying to avoid surgery at all costs."  (Id.)

On September 4, 2013, Melo stated that she still had left foot pain, and had pain to touch and pressure.  (R. 514.)  Melo understood that if she had no improvement surgery might be necessary, and Dr. Ciment provided Melo a bone stimulator to mitigate her pain.  (Id.)

On October 2, 2013, Melo stated that her left foot pain was less frequent and "less than 10" since she began using a bone stimulator, and she was "very pleased thus far with signs of

improvement." (R. 513.) Melo had slight tenderness to touch and pressure at the base of the fifth metatarsal. (Id.)

On November 6, 2013, Melo reported left foot pain despite the use of a CAM walker and bone stimulator. (R. 512.) Dr. Ciment noted that x-rays revealed "evidence of fracture" and no "evidence of healing base of 5th metatarsal." (Id.) Dr. Ciment stated that Melo was interested in surgery and was sent for medical clearance. (Id.)

On March 19, 2014, Melo stated that she was ready for surgery on her left foot. (R. 511.) Dr. Ciment wrote: "Pending medical clearance, we will proceed with procedure." (Id.)

On March 10, 2015, Dr. Ciment completed a podiatrist's physical disability report. (R. 342-48.) Dr. Ciment diagnosed Melo with a contusion and bursitis of the left foot resulting in "pain to touch" and "pain to pressure," and stated that Melo's condition had lasted or would be expected to last at least 12 months. (R. 342-43.) Dr. Ciment opined that Melo would have to lie down during the day, but did not specify why or for how long. (R. 344.) Dr. Ciment further opined that, in an eight hour workday, Melo could sit continuously for a total of two hours, and stand continuously for 20 minutes at a time for a total of one hour, but would not be able to walk at all. (R. 345.) Melo could frequently lift and carry up to five pounds and occasionally lift and carry up to ten pounds, but never anything heavier. (R. 345-46.) Melo could occasionally bend, but never squat, crawl, climb or reach. (R. 346.) Melo also could frequently handle and finger with both hands, but only occasionally push and pull. (Id.) Melo could never or at most occasionally use her left foot "for repetitive movements, such as pushing and pulling of leg controls," but could frequently do so with her right foot. (R. 347.) Melo had no restrictions involving unprotected heights, moving machinery, exposure to marked changes in temperature/humidity, driving a vehicle, or exposure to dust, fumes or gases. (Id.) Melo would have difficulty traveling to work alone using

public transportation because she would be "off balance." (Id.)

On March 11, 2015, Melo reported that she "ha[d] not followed up since last visit approximately one year ago stating that she had no pain since last visit." (R. 509.) Melo remained compliant with her prescribed course of treatment, but two weeks before "she fell and banged her foot" causing her pain to return albeit "[n]ot as intense or as frequent." (Id.) Review of Melo's systems was unremarkable, she had tenderness to touch and pressure in her left foot, and she was referred for x-rays to rule out a fracture. (Id.)

On March 18, 2015, Melo had a follow-up visit with Dr. Ciment for her left foot pain "secondary to recent trauma." (R. 507.) Melo stated that "she still ha[d] some pain, not as painful, not as frequent as since last visit." (Id.) Review of Melo's systems was unremarkable and revealed no acute changes. (Id.) Melo's March 11, 2015 x-ray revealed no "fracture or dislocation," "[n]o calcaneal spurs," unremarkable soft tissue and "[n]o lytic or blastic lesions." (Id.; see also R. 508.)

On April 15, 2015, Melo stated that she maintained compliance with her prescribed course of treatment (CAM walker, bone stimulator, NSAID and pain cream), and that "her pain [was] considerably better since initial presentation for most recent injury." (R. 517.) Review of Melo's systems was unremarkable and she had minimal discomfort to touch at the base of her fifth metatarsal. (Id.)

**Dr. John Halkias**

On March 12, 2015, Dr. John Halkias of Jerome Avenue Clinic completed a mental impairment disability form. (R. 349-56.) Dr. Halkias wrote that he first saw Melo on December 18, 2014 and last saw her on March 12, 2015, the date of his report. (R. 349.) Dr. Halkias opined that Melo had moderate to severe depression and anxiety, her current level of adaptive functioning was poor, and her GAF scores had ranged from 55 to 65 in the past year. (Id.) Dr. Halkias wrote that

Melo was alert and oriented x3, her speech was goal directed, she had no acute suicidal ideation, no delusions or hallucinations, and her cognition was intact. (R. 350.) However, Melo was depressed and anxious, had a constricted affect, and her insight and judgment were mildly impaired. (Id.) Melo would have difficulty using public transportation alone because of her anxiety, particularly in crowds. (R. 351.) Dr. Halkias opined that Melo had moderate limitations in activities of daily living, marked difficulties maintaining social functioning, marked difficulties in "concentration, persistence or pace resulting in failure to complete tasks in a timely manner," and had repeated (three or more) episodes of decompensation in work-like settings. (R. 352-53.)

Melo also had marked limitations in her ability to remember locations and work-like procedures; understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination with others without being distracted; complete a normal workday and work week without interruptions from psychologically based symptoms; get along with coworkers and peers; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently. (R. 354-56.) Melo was moderately limited in her ability to understand, remember and carry out very short and simple instructions; make simple work related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instruction and respond appropriately to supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards. (R. 354-55.) Dr. Halkias opined that Melo's condition lasted or would be expected to last 12 months. (R. 350.)

**St. Barnabas Hospital**

On July 13, 2015, Melo underwent a three-phase bone scan that revealed increased blood flow in the right foot "diffusely compared with the left," a "persistent abnormal uptake . . . at the bilateral calcanei, right more than left," and a "delayed uptake . . . at the base of the left fifth metatarsal." (R. 518.) The reviewing physician wrote that the delayed uptake at the fifth metatarsal "possibly represent[ed] sequela of fracture," and that the abnormal uptake at the bilateral calcanei "possibly represent[ed] enthesophyte formation." (Id.) However, evaluation of the study was "limited due to lack of available radiographs for comparison." (Id.)

**ALJ Loewy's Decision**

On September 25, 2015, ALJ Loewy denied Melo's application for benefits. (R. 32-48.) ALJ Loewy applied the appropriate five step legal analysis. (R. 36-37.) First, ALJ Loewy found that Melo had "not engaged in substantial gainful activity since July 22, 2012, the alleged onset date." (R. 37.) Second, ALJ Loewy determined that Melo had "the following severe impairments: diabetes and status post ankle fracture." (Id.)

Third, ALJ Loewy found that Melo did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 41.) "In reaching this finding," ALJ Loewy "considered listing 1.02 Major dysfunction of a joint(s)." (Id.) ALJ Loewy wrote that Melo's condition did not meet Listing 1.02 because the evidence did "not reflect the requisite gross anatomical deformity with evidence of joint space narrowing, bony destruction, or ankylosis, resulting in inability to perform fine and gross movements effectively, as described in the listing." (R. 41.)

ALJ Loewy also noted that Melo's diabetes was a severe impairment, but there was no specific Listing for diabetes. (Id.) ALJ Loewy, however, considered Melo's diabetes under

Listing 9.00 related to endocrine disorders. (R. 41.) Melo did not meet Listing 9.00 "because the evidence [did] not demonstrate that [Melo's] diabetes mellitus caused significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station, despite prescribed treatment, as described by the listing." (Id.)

> ALJ Loewy found that Melo had the residual functional capacity ("RFC") to:
>
> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can sit for a total of up to 7 hours, and stand/walk for a total of up to 1 hour in an 8-hour workday. She is limited to work that can be performed while using a cane for ambulation to and from the workstation. [Melo] can occasionally climb ramps and stairs, but only a few steps, and rarely full flights. She can occasionally balance, stoop, crouch, and squat, and never kneel or crawl. [Melo] can occasionally push and pull with the bilateral upper extremities, and never operate foot controls or levers with the left foot. In addition, she must avoid concentrated exposure to hazardous machinery and unprotected heights.

(R. 41.)

ALJ Loewy wrote that Melo was no longer very active and testified that she suffered from limited mobility due to her left foot fracture. (R. 42-43.) ALJ Loewy also noted that Melo suffered from diabetes and mental impairments. (R. 43.)

ALJ Loewy wrote that Melo treated with Dr. Halkias for depression and panic attacks. (Id.) ALJ Loewy noted that Melo first saw Dr. Halkias on December 18, 2014 and last saw him on March 12, 2015 when he completed a mental impairment disability form. (Id.) ALJ Loewy found that Dr. Halkias' "opinion that [Melo] ha[d] mostly marked mental health limitations [was] vague and his statement that [Melo] has had repeated episodes of decompensation [was] unsupported by the record." (Id.) ALJ Loewy gave Dr. Halkias' opinion "little weight as this provider saw [Melo] 1 or 2 times before completing the form, and has not provided a comprehensive mental status examination to support his opinion." (Id.) ALJ Loewy noted that she "attempted to

develop the record by issuing a subpoena to the Jerome Avenue Clinic where [Melo saw Dr. Halkias], however the records received did not contain any treatment notes from him." (Id.)

ALJ Loewy found that although Melo's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Melo's statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. (Id.) Melo's allegation that her diabetes prevented her from working was "not consistent with the treating evidence of record" that indicated Melo was non-compliant with her medication and suffered high blood sugar levels, but without complications. (Id.) ALJ Loewy acknowledged that Dr. Martinez wrote in two letters that Melo's diabetes was uncontrolled and that she had difficulty controlling her condition due to her work schedule. (Id.)[3] However, ALJ Loewy found that Dr. Martinez's statement was inconsistent with her treatment records showing that Melo "reported generalized body ache, but denied headache, shortness of breath, polyuria, polydipsia, nocturia, blurred vision, fever, nausea, vomiting, and headache," and diagnosed Melo with diabetes "without mention of complication." (R. 43-44.) Melo also "denied retinopathy, nephropathy, and neuropathy" during her consultative examination with Dr. Joshi. (R. 44.)

Melo's testimony that her left ankle fracture prevented her from working was inconsistent with her testimony that she "declined to have recommended surgery, despite being cleared for it multiple times, according to the evidence." (R. 43.) ALJ Loewy further noted that Melo had full strength in her bilateral upper and lower extremities with no sensory deficit during her examination with Dr. Joshi, and Melo stated that she was able to shower, bathe, dress and cook

---

[3]     The Court notes that Melo stopped working in 2008 (see page 2 above), and was not working at the time of Dr. Martinez's August 16, 2012 and July 2013 letters that ascribe Melo's difficulty controlling her diabetes to her "work schedule." (See pages 6-7 above.)

daily, and clean and do laundry weekly. (R. 44-45.) In her January 2014 FEGS evaluation, Melo reported difficulty standing, sitting and walking, but also "stated that she bathed, dressed, and groomed herself, prepared meals, and performed housekeeping tasks, albeit with difficulty." (R. 45.) On examination, Melo's gait was steady and her posture was normal. (Id.) Moreover, in March 2015, Melo told "Dr. Ciment that she had not followed up since her last visit approximately 1 year prior, because she had not had pain since that time." (Id.) An x-ray of Melo's left foot showed no fracture, dislocation or calcaneal spurs. (Id.)

ALJ Loewy gave great weight to Dr. Joshi's opinion that Melo should avoid heavy lifting, carrying, pushing and pulling, and avoid prolonged walking, climbing or standing, as it was supported by the record as a whole, which demonstrated that Melo's left ankle fracture caused "persistent symptoms despite [her] course of treatment" with medication. (Id.) ALJ Loewy wrote that Dr. Joshi's opinion accounted for Melo's "subjective complaints, as well as her own reported retained capacity to perform tasks such as activities of daily living despite her severe musculoskeletal and endocrine impairments." (Id.)

ALJ Loewy gave some weight to FEGS Dr. Sawlani's opinion that Melo could lift, push and pull up to ten pounds, stand and walk less than one hour at a time, could occasionally kneel and squat, and had no sitting or reaching limitations. (R. 45-46.) ALJ Loewy found that Dr. Sawlani's opinion was "consistent with the evidence as a whole," and accounted for Melo's "subjective complaints, as well as her own reported retained capacity to perform tasks such as activities of daily living despite her severe musculoskeletal and endocrine impairments." (R. 46.)

ALJ Loewy gave little weight to Dr. Martinez's opinion that Melo could sit, stand and walk for two hours at a time; lift up to five pounds; never bend, squat, crawl or reach; occasionally perform fine manipulation; never perform pushing and pulling using arm controls with her upper

extremities; and never use her bilateral extremities for repetitive movements such as pushing or pulling using leg controls.  (Id.)  ALJ Loewy found that Dr. Martinez's opinion was unsupported by the evidence as a whole, and inconsistent with Dr. Martinez's "own treatment notes which reflect full musculoskeletal and extremities [range of motion] and no diabetic neuropathy."  (Id.)

ALJ Loewy gave little weight to Dr. Ciment's opinion that Melo could sit for two hours, stand for one hour; not walk at all in an eight-hour workday; lift and carry up to five pounds frequently and ten pounds occasionally; occasionally bend; never squat, crawl, climb or reach; frequently handle and finger; occasionally push and pull with her upper extremities; frequently push and pull with her right foot, never with the left and occasionally with both.  (Id.)  ALJ Loewy found that Dr. Ciment's opinion was entitled to little weight because it was unsupported by the evidence as a whole, and Dr. Ciment's own treatment notes that revealed mild findings.  (Id.)  "In fact, after seeing [Melo] for 6 visits from 2013 to early 2014, [Melo] was not seen again for follow up with [Dr. Ciment for] a full year because as she reported on March 10, 2015, the day [Dr. Ciment] completed the . . . medical source statement, she had been asymptomatic and had no pain over the last year."  (Id.)

ALJ Loewy gave little weight to Ms. Blanco's third-party function report because it was unsupported by the medical evidence.  (Id.)  ALJ Loewy also noted that the record did not reflect whether Blanco was "medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms."  (Id.)  Moreover, Blanco met with Melo one time and only recorded Melo's responses to the questions on the form.  (Id.)

ALJ Loewy concluded that her RFC assessment was supported by the record evidence, which demonstrated Melo's status post left ankle fracture with persistent symptoms despite

her course of treatment with pain medication. (Id.) The evidence also demonstrated Melo's diabetes with elevated blood glucose levels, somewhat owing to Melo's non-compliance with medication. (Id.) ALJ Loewy stated that the RFC accounted for Melo's subjective complaints, and reported physical capacity to perform her activities of daily living despite her musculoskeletal and endocrine impairments. (R. 46-47.)

ALJ Loewy next determined that Melo was "capable of performing her past relevant work as a telemarketer, as it is generally performed in the national economy," which did "not require the performance of work-related activities precluded by" Melo's RFC. (R. 47.)[4] ALJ Loewy wrote that the job of telemarketer, as generally performed, is a semiskilled sedentary position with a Specific Vocational Preparation rating of 3. (Id.) Maraco also testified that the exertional demands of a telemarketer did not exceed Melo's RFC. (Id.)[5]

ALJ Loewy accordingly ended her analysis at step four and found that Melo had "not been under a disability, as defined in the Social Security Act, from July 22, 2012, through the date of [her] decision," September 25, 2015. (R. 47-48.)

---

[4] ALJ Loewy noted: "Although the hypothetical posed to the vocational expert included a limitation of frequent crouching, the undersigned is finding that [Melo] can crouch occasionally. The undersigned personally checked Occubrowse and the position of telemarketer . . . has no crouching requirements." (R. 41 n.1.)

[5] At the hearing, Melo's attorney suggested that Melo's telemarketing position, as she performed it, was better classified as a door-to-door salesman rather than a telemarketer, given that she worked three days per week outside soliciting business and spent the remainder of her time in the office. (R. 76.) Maraco testified that Melo therefore performed a composite position, i.e., a combination between telemarketer and door-to-door salesman (the latter being a light exertional position) because "[i]t has elements of both." (R. 78-79, 82-83.) However, ALJ Loewy wrote that Melo previously described her position as a sedentary job where she sat for eight hours per day, and thus gave no weight to Maraco's classification of the position as a composite job. (R. 47.) ALJ Loewy found that classifying the position as telemarketer as generally performed was accurate. (Id.)

## ANALYSIS

### I.    THE APPLICABLE LAW

#### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[6/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S.

---

[6/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270.[7]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[8]

**B.    Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[9]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded to the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[7]    See also, e.g., <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[8]    See, e.g., <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[9]    See also, e.g., <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[10]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[11] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[12]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[10]  See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[11]  See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[12]  See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[13]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See,

----

[13]    Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[14/]

   C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[14/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[15/]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).[16/]

---

[15/] <u>See also</u>, <u>e.g.</u>, <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346-47 (2d Cir. 2005); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

[16/] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. <u>See</u> 20
(continued...)

## II.     APPLICATION OF THE FIVE STEP SEQUENCE

### A.     Melo Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Melo was engaged in substantial gainful activity after her application for benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Loewy's conclusion that Melo did not engage in substantial gainful activity during the applicable time period (see page 18 above) is not disputed and benefits Melo. (See generally Dkt. No. 14: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.     Melo Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Melo proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Loewy determined that Melo's severe impairments were "diabetes and status

---

16/     (...continued)
C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

post ankle fracture." (See page 18 above.)[17] ALJ Loewy's findings regarding the step-two severity

of these impairments benefit Melo. Accordingly, the Court proceeds to the third step of the five-part

analysis.

### C.     Melo Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Melo had an

impairment listed in Appendix 1 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude

gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is

conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019,

1022 (2d Cir. 1995).

#### 1.     Listing 1.02: Major Dysfunction Of A Joint

Listing 1.02 outlines the conditions required to establish disorders of the joint. 20

---

[17]    Although ALJ Loewy found that Melo's mental impairments were not "severe" (R. 37-41),
she found that some of Melo's physical impairments were, and thus proceeded to the
subsequent steps of the analysis during which she properly considered Melo's mental
impairments in determining her RFC. (See pages 19-20 above.) See, e.g., Vasquez v.
Berryhill, 16 Civ. 6707, 2017 WL 1592761 at *19-20 (S.D.N.Y. May 1, 2017) (Peck, M.J.)
("Regardless of severity, an ALJ must consider all of a claimant's impairments in
determining the appropriate RFC. . . . [E]ven if ALJ Walters erred in finding [plaintiff's]
knee pain non-severe at step two, any error would be harmless because ALJ Walters
identified other severe impairments and discussed [plaintiff's] knee pain at subsequent steps
of the analysis."). Moreover, although ALJ Loewy found that Melo's hypertension was not
a severe impairment (R. 37), there is little evidence that this condition affected Melo in any
meaningful way, let alone negatively impacted her RFC or ability to work generally. As
such, any error in failing to address Melo's hypertension more fully was harmless. (See Dkt.
No. 14: Comm'r Br. at 18-19 ("[A]lthough Plaintiff's blood pressure was occasionally high
due to noncompliance with treatment, Dr. Martinez's treatment notes indicated that Plaintiff
was largely asymptomatic. Therefore, the ALJ appropriately found Plaintiff's hypertension
to be a non-severe impairment." (record citations omitted)).)

C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.[18/]  To constitute an Appendix 1 impairment, Melo's left ankle fracture must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  "Inability to ambulate effectively" means:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  "To ambulate effectively,"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).  "Inability to perform fine and gross

---

[18/]  The Listings cited in this portion of the opinion are those in effect on September 25, 2015, the date of ALJ Loewy's opinion.  (See page 18 above.)

movements effectively" means:

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c).

Substantial evidence supports ALJ Loewy's finding that Melo's condition did not meet Listing 1.02 because the evidence did "not reflect the requisite gross anatomical deformity with evidence of joint space narrowing, bony destruction, or ankylosis, resulting in inability to perform fine and gross movements effectively, as described in the listing." (See page 18 above.)

Listing 1.02 requires a showing of "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added). Dr. Joshi found no evidence of subluxations, contractures, ankylosis or thickening, and Melo's joints were stable with no redness, heat or effusion. (See page 10 above.) Moreover, Melo's September 6, 2013 left foot x-ray revealed "[n]o significant bony abnormality." (See page 11 above.) In particular, the reviewing physician found "no evidence of acute fracture, dislocation or destructive bony lesion," and "relatively well maintained" joint spaces. (Id.) Melo's March 11, 2015 x-ray revealed no "fracture or dislocation," "[n]o calcaneal spurs," unremarkable soft tissue and "[n]o lytic or blastic lesions." (See page 16 above.)

Moreover, the record indicates that Melo's left ankle condition interfered with her ability to walk long distances as ALJ Loewy acknowledged, but did not result in an "[i]nability to ambulate effectively" as defined by Listing 1.00. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). Melo often used a single cane to ambulate (see pages 3-4, 8, 10-11, 13 above), but did not exhibit an "inability to walk without the use of a walker, two crutches or two canes, . . . walk a block at a reasonable pace on rough or uneven surfaces, . . . use standard public transportation, . . . carry out routine ambulatory activities, . . . [or] climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

Nor do the records otherwise suggest that Melo had "an extreme limitation of the ability to walk; i.e., an impairment(s) that interfere[d] very seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). For example, Dr. Martinez found multiple times from July 2012 through September 2014 that Melo's musculoskeletal exam was normal. (See pages 6-8 above.) Melo stated to Dr. Joshi that she cooked, showered, bathed and dressed herself daily, and cleaned and did laundry weekly (see page 10 above); stated in the third-party function report that her condition did not affect her ability to dress, bathe, care for her hair, shave, feed herself, use the bathroom or prepare simple meals (see page 13 above); and stated during her FEGS evaluation that she traveled independently to appointments by public transportation (see page 12 above). Despite reporting left foot pain during the FEGS evaluation, Melo had no back pain, swelling, redness, joint pain, foot/leg swelling, leg pain or cramps, stiffness, limitation of movement or muscle pain. (See page 12 above.) Melo's neurological examination also was normal, she had no sensory, reflex, orientation or motor issues, and Irish observed that Melo's gait was steady and her posture was normal. (Id.) Melo furthermore told Dr. Ciment in March 2015 that she had not followed up with him for a full year

because "she had no pain since last visit."  (See page 16 above.)

As to Melo's ability "to perform fine and gross movements effectively," the records cited immediately above indicate that Melo could "prepare a simple meal and feed [her]self, . . . [and] take care of [her] personal hygiene."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(c). Moreover, Dr. Joshi found that Melo's deep tendon reflexes were physiologic and equal in the upper and lower extremities with 5/5 extremity strength, no sensory deficit was noted, her hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally.  (See pages 10-11 above.)  Dr. Ciment also opined that Melo could frequently handle and finger with both hands, and occasionally push and pull.  (See page 15 above.)

ALJ Loewy's determination that Melo did not meet Listing 1.02 is supported by substantial evidence in Melo's treatment records.

## 2.  Listing 9.00: Endocrine Disorders

Listing 9.00, related to endocrine disorders, recognizes that "[c]hronic hyperglycemia, which is longstanding abnormally high levels of blood glucose, leads to long-term diabetic complications by disrupting nerve and blood vessel functioning."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 9.00(B)(5)(a)(ii).  "[D]iabetic peripheral and sensory neuropathies" caused by chronic hyperglycemia are evaluated under Listing 11.00.  Id.  "Peripheral neuropathies" are categorized under Listing 11.14, and are disabling when accompanied by "disorganization of motor function as described in 11.04B, in spite of prescribed treatment."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.14.  Listing 11.04(B) describes "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.04(B).

ALJ Loewy found that Melo's diabetes was a severe impairment, but stated there was

no specific diabetes Listing. (See page 18 above.) ALJ Loewy, however, considered Melo's diabetes under Listing 9.00 related to endocrine disorders. (See pages 18-19 above.) Melo did not meet Listing 9.00 "because the evidence [did] not demonstrate that [Melo's] diabetes mellitus caused significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station, despite prescribed treatment, as described by the listing." (See page 19 above.)

Dr. Martinez's records frequently state that Melo either reported diabetes "without mention of complication," or denied a range of diabetic symptoms including polyuria, polydypsia, nocturia and blurred vision, despite abnormal glucose and hemoglobin A1c levels. (See pages 6-9 above.) Melo also denied retinopathy, nephropathy and neuropathy during her examination with Dr. Joshi. (See page 10 above.) Substantial evidence supports ALJ Loewy's conclusion that Melo's diabetes did not meet Listing 9.00.

**D.    ALJ Loewy's Credibility and RFC Determinations**

Before proceeding to step four, the Court will address ALJ Loewy's credibility and residual functional capacity ("RFC") determinations.

**1.    Credibility Determination**

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted).[19] In addition, "courts must

_____

[19]    See, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility
(continued...)

show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[20/] Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a

---

[19/] (...continued)
determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'"); Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[20/] Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

claimant's subjective complaints." <u>Aponte</u> v. <u>Sec'y, Dep't of Health & Human Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2 (July 2, 1996).[21] The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of

---

[21] In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's assertions about the work-preclusive nature of her symptoms. <u>See generally</u> SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); <u>see also</u>, <u>e.g.</u>, <u>Duran</u> v. <u>Colvin</u>, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR."). SSR 16-3p, however, was not made retroactive and the Court therefore applies SSR 96-7p as the ruling in effect at the time of the ALJ's decision in this case. <u>See</u>, <u>e.g.</u>, <u>Crampton</u> v. <u>Comm'r of Soc. Sec.</u>, No. 16-CV-0356, 2017 WL 2829515 at *6 n.3 (N.D.N.Y. June 29, 2017); <u>Smith</u> v. <u>Colvin</u>, No. 14-CV-1752, 2016 WL 1170910 at *7 n.3 (D. Conn. Mar. 23, 2016). In any event, the substance of the two-step process for evaluating claimants' symptoms discussed herein was not modified by SSR 16-3p. <u>Accord</u> SSR 16-3p, 2016 WL 1119029 at *3-4; <u>see also</u>, <u>e.g.</u>, <u>Burgess</u> v. <u>Colvin</u>, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (citing SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms). Rather, SSR 16-3p's updated guidance is a matter of emphasis: whereas SSR 96-7p "placed a stronger emphasis on the role of the adjudicator to make a 'finding about the credibility of the individual's statements about the symptom(s) and its functional effects' . . . S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and 'eliminate[s] the use of the term "credibility"' from sub-regulation policy." <u>Acosta</u> v. <u>Colvin</u>, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p).

Melo stated in her function report that she prepared her meals daily, did her own laundry "sometimes" with assistance from her daughter who also did the cleaning, and went shopping "every two weeks." (See page 3 above.) Melo stated that she could lift "[n]o more than 10 pounds," stand for "[p]robably 10 minutes," walk for "[m]aybe 15 minutes but helped by a cane," sit "most of the time" and use her hands. (Id.) However, Melo stated that she could not climb stairs, kneel, squat or reach. (Id.) Melo claimed that she could walk two blocks before having to stop and rest for 15 minutes. (Id.) At the hearing, Melo claimed that she did no laundry or grocery shopping. (See page 4 above.) Melo further testified that her left ankle fracture prevented her from walking more than ten minutes at a time, or standing for more than "five or six minutes" at a time, because she could not put weight on her left foot. (Id.) Melo said she only could sit without pain for "one hour more or less" because her left "foot gets numb and tense," which she alleviated by elevating her left leg and foot. (Id.)

ALJ Loewy found that although Melo's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Melo's statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. (See page 20 above.) Melo's allegation that her diabetes prevented her from working was "not consistent with the treating evidence of record" that indicated Melo was non-compliant with her medication and suffered high blood sugar levels, but without complications. (Id.) ALJ Loewy acknowledged that Dr. Martinez

wrote in two letters that Melo's diabetes was uncontrolled and that she had difficulty controlling her condition due to her work schedule.  (See page 20 above; see also page 20 n.3 above.)  However, ALJ Loewy found that Dr. Martinez's statement was inconsistent with her treatment records showing that Melo "reported generalized body ache, but denied headache, shortness of breath, polyuria, polydipsia, nocturia, blurred vision, fever, nausea, vomiting, and headache," and diagnosed Melo with diabetes "without mention of complication."  (See page 20 above.)  Melo also "denied retinopathy, nephropathy, and neuropathy" during her consultative examination with Dr. Joshi.  (Id.)

Melo's testimony that her left ankle fracture prevented her from working was inconsistent with her testimony that she "declined to have recommended surgery, despite being cleared for it multiple times, according to the evidence." (Id.)  ALJ Loewy further noted that Melo had full strength in her bilateral upper and lower extremities with no sensory deficit during her examination with Dr. Joshi, and Melo stated that she was able to shower, bathe, dress and cook daily, and clean and do laundry weekly.  (See pages 20-21 above.)  In her January 2014 FEGS evaluation, Melo reported difficulty standing, sitting and walking, but also "stated that she bathed, dressed, and groomed herself, prepared meals, and performed housekeeping tasks, albeit with difficulty."  (See page 21 above.)  On examination, Melo's gait was steady and her posture was normal. (Id.)  Moreover, in March 2015, Melo told "Dr. Ciment that she had not followed up since her last visit approximately 1 year prior, because she had not had pain since that time." (Id.)  An x-ray of Melo's left foot showed no fracture, dislocation or calcaneal spurs.  (Id.)

While ALJ Loewy did not explicitly address Melo's credibility regarding her mental impairments, she discussed the relevant psychiatric records in enough detail to provide a basis for meaningful judicial review.  See, e.g., Leung v. Berryhill, 17 Civ. 2703, 2017 WL 5953169 at *21 n.21 (S.D.N.Y. Nov. 30, 2017) (Peck, M.J.), R. & R. adopted, 2018 WL 557898 (S.D.N.Y. Jan. 22,

2018). ALJ Loewy found that Dr. Halkias' opinion that Melo had multiple marked limitations and had repeated episodes of decompensation was vague and unsupported by the record. (See page 19 above.) Dr. Halkias only saw Melo once or twice before completing the mental impairments form, and did not provide a comprehensive mental examination to support his opinion. (Id.)

### a.    Melo's Diabetes

ALJ Loewy correctly found that Melo's treatment records generally indicate that Melo's diabetes did not result in any serious complications, despite her abnormally high blood glucose and hemoglobin A1c levels. Dr. Martinez's records frequently state that Melo either reported diabetes "without mention of complication," or denied a range of diabetic symptoms including polyuria, polydypsia, nocturia and blurred vision. (See pages 6-9 above.) Melo also denied retinopathy, nephropathy and neuropathy during her examination with Dr. Joshi. (See page 10 above.)

### b.    Melo's Left Ankle Pain

In contrast to her hearing testimony, Melo stated in her function report that she prepared her meals daily, did her own laundry "sometimes" and went shopping "every two weeks." (See page 3 above.) Melo informed Dr. Joshi that she cooked, showered, bathed and dressed herself daily, and cleaned and did laundry weekly. (See page 10 above.) Melo additionally stated in her third-party function report that her condition did not affect her sleep, or ability to dress, bathe, care for her hair, shave, feed herself or use the bathroom. (See page 13 above.) Melo also prepared her own "simple meals such as steam vegetables, soups, salad, [and] chicken breast," and shopped for food weekly, albeit accompanied by her children. (Id.)

Dr. Joshi found that Melo appeared in no acute distress, had a normal gait and stance, and needed no help changing for the examination. (See page 10 above.) Moreover, Melo's cervical

spine had full flexion, extension, lateral flexion and rotary movement bilaterally; no scoliosis, kyphosis or abnormality was noted in her thoracic spine; and her straight leg raise test was negative bilaterally. (Id.) Melo had full range of motion in her shoulders, elbows, forearms, wrists and hips bilaterally, and full range of motion in her right knee and ankle. (Id.) No subluxations, contractures, ankylosis or thickening was noted, and Melo's joints were stable with no redness, heat or effusion. (Id.) Melo's deep tendon reflexes were physiologic and equal in the upper and lower extremities with 5/5 extremity strength, and no sensory deficit was noted. (Id.) Melo's extremities revealed no cyanosis, clubbing, edema, significant varicosities, trophic changes or muscle atrophy; her pulses were physiologic and equal; her hand and finger dexterity was intact; and her grip strength was 5/5 bilaterally. (See pages 10-11 above.)

Melo furthermore told Dr. Ciment in March 2015 that she had not followed up with him for a full year because "she had no pain since last visit." (See page 16 above.) ALJ Loewy also noted that Melo's x-rays were normal. Melo's September 6, 2013 left foot x-ray revealed "[n]o significant bony abnormality." (See page 11 above.) In particular, the reviewing physician found "no evidence of acute fracture, dislocation or destructive bony lesion," and "relatively well maintained" joint spaces. (Id.) Melo's March 11, 2015 x-ray revealed no "fracture or dislocation," "[n]o calcaneal spurs," unremarkable soft tissue and "[n]o lytic or blastic lesions." (See page 16 above.)

### c.  Melo's Psychiatric Impairments

Melo's statements concerning her mental impairments are the best evidence that her psychiatric condition was not disabling. Melo stated in her function report that she spent time with others including a church support group "generally once a week," and had no problems getting along with family, friends, neighbors or others. (See page 3 above.) Melo further claimed that she had

no problems paying attention, could finish what she started, and could follow written and spoken instructions. (See page 4 above.) Although Melo stated that she had problems getting along with authority figures, she did not explain why, and further stated that she had not lost a job because of problems getting along with others. (Id.) When asked how "stress or changes in schedule affect" her, Melo responded that she handled those situations well. (Id.)

At her FEGS evaluation, Melo stated that she had no mental health conditions, had never been told by a mental health provider that she had mental health issues, and had never received mental health treatment. (See page 12 above.) Melo further stated that she had never thought about killing herself and denied auditory or visual hallucinations. (Id.) Melo liked to read every day, spoke with her children about three times per day, and went to church when able. (Id.) Melo was cooperative, friendly and neatly dressed, had a normal affect and mood, a coherent thought process, appeared stable and was oriented x3. (Id.)

In her third-party function report, Melo stated that she spent time with her family, visited with her children every Sunday and had no problems getting along with family, friends, neighbors or others. (See page 13 above.) Melo could pay attention, finish what she started, follow written and spoken instructions, had no issues with authority figures and had not lost a job because of problems getting along with others. (See page 14 above.) When asked if Melo could handle stress and changes in her routine, Blanco wrote "N/A," and stated that she did not notice Melo exhibit any unusual behaviors or fears. (Id.)

* * *

ALJ Loewy properly applied the two-part credibility test and supported her determination with substantial evidence in Melo's treatment records regarding her diabetes, left ankle pain and psychiatric impairments.

## 2.     Residual Functional Capacity Determination

ALJ Loewy found that Melo had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she
> can sit for a total of up to 7 hours, and stand/walk for a total of up to 1 hour in an 8-
> hour workday.  She is limited to work that can be performed while using a cane for
> ambulation to and from the workstation.  [Melo] can occasionally climb ramps and
> stairs, but only a few steps, and rarely full flights.  She can occasionally balance,
> stoop, crouch, and squat, and never kneel or crawl.  [Melo] can occasionally push
> and pull with the bilateral upper extremities, and never operate foot controls or levers
> with the left foot.  In addition, she must avoid concentrated exposure to hazardous
> machinery and unprotected heights.

(See page 19 above.)  Sedentary work involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles
> like docket files, ledgers, and small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often necessary
> in carrying out job duties. Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Substantial evidence in Melo's treatment records supports an RFC for sedentary work

with the above accommodations.

As detailed above, Melo retained the ability to perform a variety of activities of daily

living despite her impairments, as documented in her function report, examination with Dr. Joshi

and third-party function report.  (See pages 41-43 above.)  Moreover, the records from Dr. Martinez,

Dr. Joshi, Dr. Ciment and the third-party function report document numerous normal physical

findings.  The majority of Dr. Martinez's treatment notes state that Melo was in no acute distress

and, on the occasions when Dr. Martinez physically examined Melo, the results were normal.[22]

---

[22]     (See R. 414 (7/26/12: alert, oriented, in no acute distress, well developed, normal
musculoskeletal examination with full range of motion, full range of motion in extremities
with no clubbing, cyanosis or edema, and normal diabetic foot examination); R. 406
(continued...)

Although Dr. Joshi found that Melo could not walk on heels or toes or squat, had left foot pain, difficulty getting on and off the examination table and rising from her chair, and limited lumbar spine flexion and extension, the remainder of his report was normal. (See pages 10-11 above.) Melo furthermore told Dr. Ciment in March 2015 that she had not followed up with him for a full year because "she had no pain since last visit." (See page 16 above.) Finally, Melo's x-rays were normal. Melo's September 6, 2013 left foot x-ray revealed "[n]o significant bony abnormality." (See page 11 above.) In particular, the reviewing physician found "no evidence of acute fracture, dislocation or destructive bony lesion," and "relatively well maintained" joint spaces. (Id.) Melo's March 11, 2015 x-ray revealed no "fracture or dislocation," "[n]o calcaneal spurs," unremarkable soft tissue and "[n]o lytic or blastic lesions." (See page 16 above.) Given this evidence, ALJ Loewy was entitled to discount Dr. Martinez's and Dr. Ciment's opinions as inconsistent with the evidence as a whole and these providers' own treatment notes. (See pages 21-22 above.) See, e.g., Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . . " (citation omitted)).

There furthermore is no indication that Melo's diabetes restricted her RFC any

---

[22]/ (...continued)
(1/25/13: no acute distress, full range of motion in extremities with no clubbing, cyanosis or edema); R. 391 (2/6/14: no acute distress, normal musculoskeletal exam with full range of motion, full range of motion in extremities with no clubbing, cyanosis or edema, alert, oriented, and normal cerebellar function, cognitive exam, cranial nerves, gait, motor strength in the upper and lower extremities, strength, tone, reflexes and sensory exam).)

further.  Dr. Martinez's records frequently state that Melo either reported diabetes "without mention of complication," or denied a range of diabetic symptoms including polyuria, polydypsia, nocturia and blurred vision, despite abnormal glucose and hemoglobin A1c levels.  (See pages 6-9 above; see also Dkt. No. 14: Comm'r Br. at 23 ("[A]lthough Plaintiff's diabetes was uncontrolled due to her non-compliance with medications, she had no complications from the diabetes.").)  Melo also denied retinopathy, nephropathy and neuropathy during her examination with Dr. Joshi.  (See page 10 above.)

Finally, there is almost no evidence that Melo suffered from serious mental impairments, despite Dr. Halkias' function report that stated Melo had multiple marked impairments. (See pages 16-17 above.)  As discussed above, Melo's statements in her function report, FEGS evaluation and third-party function report contradict any argument that her mental impairments were marked or extreme.  (See pages 42-43 above.)  Indeed, at her FEGS evaluation, Melo stated that she had no mental health conditions, had never been told by a mental health provider that she had mental health issues, and had never received mental health treatment.  (See page 12 above.)

Although Dr. Halkias' mental impairments report and treatment of Melo from December 18, 2014 through March 12, 2015 post-date the function report, FEGS evaluation and third-party function report, there are no treatment notes from Dr. Halkias in the record that would support his opinions.  (See pages 3, 11, 13, 16 above.)  ALJ Loewy accordingly gave Dr. Halkias' opinion "little weight as this provider saw [Melo] 1 or 2 times before completing the form, and has not provided a comprehensive mental status examination to support his opinion."  (See page 19 above.)  ALJ Loewy noted that she "attempted to develop the record by issuing a subpoena to Jerome Avenue Clinic where [Melo saw Dr. Halkias], however the records received did not contain any treatment notes from him."  (See pages 19-20 above.)  Thus, ALJ Loewy provided good reasons,

supported by substantial evidence, for rejecting Dr. Halkias' opinion. See 20 C.F.R. § 404.1527(c)(2)-(6) (the length of the treatment relationship, the frequency of examination, the evidence that supports the treating physician's report, and the consistency of the treating physician's opinion with the record as a whole are relevant to the weight given to treating physician opinion); see also cases cited at pages 28-29 above.[23]

The Court concludes that ALJ Loewy's RFC determination was supported by substantial evidence.

### E. Melo Had The Ability To Perform Her Past Work As A Telemarketer, As Generally Performed

The fourth step of the five-step analysis asks whether Melo had the residual functional capacity to perform her past relevant work. The Second Circuit has "held that in the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally. This inquiry

---

[23] Moreover, ALJ Loewy fulfilled her duty to develop the record. At the March 24, 2015 hearing, ALJ Loewy expressed concern that Melo's records were "quite old." (See page 4 above.) Melo's attorney stated that Melo had received "treatment only from one place" since 2010, "Jerome Medical Center . . . for her physical problems and her mental limitations." (Id.) ALJ Loewy issued a subpoena to Jerome Avenue Clinic where Dr. Halkias practiced on March 28, 2015. (See page 5 above.) See, e.g., Goulart v. Colvin, No. 15-CV-1573, 2017 WL 253949 at *4 (D. Conn. Jan. 20, 2017); Johnson v. Colvin, No. 12-CV-1273, 2013 WL 6145804 at *2 n.5 (N.D.N.Y. Nov. 21, 2013) ("[B]y issuing the subpoena, the ALJ satisfied her duty to develop the record."). At the July 21, 2015 hearing, ALJ Loewy again raised the issue of Melo's missing psychiatric treatment records. (See page 5 above ("ALJ: . . . . Were you planning to give me records from the psychiatrist? Because you know I'm not going to give it much weight without records.").) Melo's attorney responded that ALJ Loewy subpoenaed Jerome Avenue Clinic and evidently obtained all of Melo's available records; indeed, Melo's attorney stated: "[W]e've got all their records." (Id.; see also Comm'r Br. at 22 ("[T]he ALJ subpoenaed all treatment records from Jerome Medical Center where Dr. Halkias practiced, Jerome Medical Center included no notes from Plaintiff's treatment with Dr. Halkias in its production, and Plaintiff's counsel told the ALJ that she had all records from Jerome Medical Center.").) ALJ Loewy was not obligated to further develop the record under these circumstances.

requires separate evaluations of the previous specific job and the job as it is generally performed." Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (citations omitted); see also, e.g., Iqbal v. Comm'r of Soc. Sec., No. 16-CV-0722, 2017 WL 3475492 at *5 (N.D.N.Y. Aug. 11, 2017); Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413, 427 (S.D.N.Y. 2016); Rivera v. Colvin, 15 Civ. 3857, 2015 WL 9591539 at *20 (S.D.N.Y. Dec. 18, 2015) (Peck, M.J.) (ALJ's "finding that [plaintiff] could perform her past relevant work as a cleaner as generally performed is sufficient to negate a finding of disability at step four."). To determine whether an individual can return to her past work "as it is generally performed," "[t]he inquiry . . . is not whether a claimant is able to perform the duties of her previous job, but whether the claimant is able to perform the duties associated with her previous 'type' of work." Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord, e.g., Nobile v. Comm'r of Soc. Sec., No. 16-CV-0871, 2017 WL 3054846 at *4 (N.D.N.Y. July 19, 2017); Matthew v. Colvin, No. 13-CV-5336, 2015 WL 5098662 at *8 (E.D.N.Y. Aug. 31, 2015).

ALJ Loewy determined that Melo was "capable of performing her past relevant work as a telemarketer, as it is generally performed in the national economy," which did "not require the performance of work-related activities precluded by" Melo's RFC. (See page 23 above.)[24/] ALJ Loewy wrote that the job of telemarketer, as generally performed, is a semiskilled sedentary position with a Specific Vocational Preparation rating of 3. (Id.) Maraco also testified that the exertional demands of a "telemarketer as defined in the DOT" did not exceed Melo's RFC. (See page 6 above.) ALJ Loewy thus ended her analysis at step four and found that Melo had "not been under a disability, as defined in the Social Security Act, from July 22, 2012, through the date of [her]

---

[24/] ALJ Loewy noted: "Although the hypothetical posed to the vocational expert included a limitation of frequent crouching, the undersigned is finding that [Melo] can crouch occasionally. The undersigned personally checked Occubrowse and the position of telemarketer . . . has no crouching requirements." (R. 41 n.1.)

decision," September 25, 2015. (See page 23 above.) ALJ Loewy's determination that Melo could perform the job of telemarketer as generally performed was supported by substantial evidence in Melo's treatment records, the RFC determination, and the vocational expert's testimony. (See Dkt. No. 14: Comm'r Br. at 24-25 ("A finding that a claimant can perform her past relevant work as generally performed at step four is sufficient to negate a finding of disability at step four, and it is not necessary to determine whether the plaintiff could perform her past relevant work as actually performed. . . . Accordingly, the ALJ concluded that Plaintiff's RFC permitted her to perform her past work as a telemarketer as generally performed, and therefore Plaintiff was not disabled.").)

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Melo was not disabled within the meaning of the Social Security Act during the period from July 22, 2012 to September 25, 2015 is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) is GRANTED.


SO ORDERED.

Dated:      New York, New York
            February 13, 2018


_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:      Counsel
                    Ms. Melo (mail)